# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHER DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOHN VALLERYAN DZIEKAN, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 12 C 3211 |
| v. ) | |
| ) | Magistrate Judge Jeffrey Cole |
| CAROLYN COLVIN, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

John Dziekan seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("the Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2). Mr. Dziekan asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## INTRODUCTION

This is a disturbing case on several levels. Its procedural history exemplifies the bureaucratic morass and insensitivity with which government agencies are so often charged. And, as we shall see, the Administrative Law Judge simply exacerbated an already unfortunate situation. Of course, mistakes are inevitable. All judges make them. *Willy v. Coastal Corp.,* 503 U.S. 131, 139 (1992); *Fujisawa Pharmaceutical Co., Ltd. v. Kapoor,* 115 F.3d 1332 (1997)(Posner, J.); *Olympia Equipments v. Western Union*, 802 F.2d 217, 219 (7th Cir. 1986). It could hardly be otherwise: "[a]ll systems of law, however wise, are administered through men [and women], and therefore may occasionally disclose the[ir] frailties.... Perfection may not be demanded of law, but

the capacity to correct errors of inevitable frailty is the mark of a civilized legal mechanism." Frankfurter, The Case of Sacco and Vanzetti, 108 (Universal Library ed.1962). Hopefully, this opinion will set the stage for the plaintiff to have the "full and fair" administrative hearing that due process requires, *Davenport v. Astrue,* 417 Fed.Appx. 544, 546 (7th Cir.2011), but which he has not yet had.

# I.
# PROCEDURAL HISTORY

Mr. Dziekan filed his claim for DIB on December 3, 2009, alleging that he had been unable to work since November 10, 2009, due to a heart attack and coronary artery disease. (R. 67-73, 114). His claim was initially denied on April 26, 2010 (R. 32, 34-37), and he filed for reconsideration. (R. 38-39). As a part of the process, Mr. Dziekan was scheduled for a consultative examination but, on August 4, 2010, he received a notice from the disability agency indicating that the examination had been cancelled because it was "no longer needed." (R. 81). The next thing Mr. Dziekan knew, on September 7, 2010, his claim was denied on reconsideration because he refused to have a consultative examination. (R. 48, 61).

Mr. Dziekan filed a request for a hearing before an administrative law judge ("ALJ"). (R. 51). Given the foul up with the consultative exam, Mr. Dziekan also took no chances and resorted to his congressman's office. They forwarded some evidence and requested a hearing and an "On the Record Review" on September 20, 2010. (R. 76-78). The request was acknowledged by the disability agency on October 13, 2010, which indicated a hearing was being scheduled. (R. 102). On September 21, 2010, Mr. Dziekan submitted a "Request For Hearing Based On File" (R.179-81), in which he stated, "[w]e want a judge to make a decision based on the records you have." (R. 180). He noted that he had received a notice that his claim had been denied because he did not go to his

consultative examination. He added that he had made a small amount of money from working a little, but had no choice because processing his claim was taking so long. (R. 180-81).

It would continue to do so. After a wait of a few months, On December 10, 2010, Mr. Dziekan filed a Social Security form entitled, "Waiver Of Your Right To Personal Appearance Before An Administrative Law Judge." (R. 58-59). The form asks why the claimant wants to have their case decided on the written evidence and for the reason the claimant did not want to appear at their hearing. In response, Mrs. Dziekan – Mr. Dziekan's wife filled out the form – indicated that an attorney had told them that Mr. Dziekan's heart condition met the listing – §4.00(C) – for cardiac impairments. She also stated that they "financially cannot wait until April for a hearing. Our house has been for sale since summer with 19 showings and no offers. We cannot afford to live here anymore." (R. 58). She added that her husband's claim had initially been denied for his failure to show up at a consultative examination, and explained that they had received a cancellation notice from the disability agency. (R. 58).

Mrs. Dziekan got this form from the office of the ALJ assigned to the case. While pleading their case, Mrs. Dziekan requested several times that a decision be made quickly, but also that they be present to explain things and answer any questions that might come up. She was told if they wanted an expedited hearing on the record, they could not be present. If the claim was denied, however, they could get another hearing date from the Appeals Council. Given their financial situation, this was the route they chose – or more accurately were compelled to choose. They were trepidatious about signing the waiver form, but figured it would be alright since they could still get a hearing. (R. 3-4). The Commissioner does not challenge Mrs. Dziekan's version of this exchange.

3

An ALJ denied Mr. Dziekan's claim shortly thereafter, on January 28, 2011, finding that Mr. Dziekan could continue to perform his past work as a photojournalist. (R. 14-31). This became the final decision of the Commissioner when the Appeals Council denied Mr. Dziekan's request for review of the decision on April 19, 2011. (R. 1-6). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Dziekan has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE OF RECORD

### A.
### The Vocational Evidence

Mr. Dziekan was born on October 22, 1954, making him 56 years old at the time of the ALJ's decision. (R. 103). He has worked for over thirty years as photojournalist. (R. 106). He was on his feet, standing or walking, the entire workday, and had to lift and carry equipment weighing 25 to 100 pounds. Most commonly, he was lifting and carrying 50 pounds. (R. 103). He stopped working when he suffered a heart attack in November of 2009. (R. 113).

### B.
### The Medical Evidence

On November 10, 2009, Mr. Dziekan developed nausea and epigastric pain which increased to the point that he went to the emergency room at Provena Mercy Medical Center in Aurora, Illinois (R. 251-53). There, he was noted to have an abnormal EKG and immediately went into surgery for cardiac catheterization. (R. 256). His right coronary artery was 100% occluded and had to be stented. He also had disease in several other arteries that were not repaired at that time. (R. 253). On November 11, 2009, Mr. Dziekan had an echocardiogram that showed left ventricular (LV) ejection fraction at 55% with inferior wall hypokinesis, along with a mild mitral, and mild tricuspid

regurgitation. There was also mild pulmonary incompetence, but no pericardial or pleural effusion was noted. Diastolic function of the left ventricle was normal. (R. 259).

On November 18, 2009, he was said to be Functional Class I, but testing revealed his Lipoprotein level to be extremely elevated at 267.6, putting him in a high cardiovascular risk category. (R. 271). Dr. Abbas Khawaja reported that he had an acute inferior wall myocardial infarction. The right coronary was totally occluded and stented with 3 x 18 promus stent. He had multiple areas of stenosis in the diagonal branches and marginal branches that could be angioplastied in the sequential way or could be subjected to AC bypass. (R. 256). The doctor noted a long-standing history of hypertension. (R. 257). The first septal perforator also had significant stenosis. (R. 260). That same day, Dr. Joseph C. Marek reported:

> Coronary artery disease status post aborted acute inferior MI. Given that he had 4 hours of discomfort, he may have sustained significant myocardial damage. This remains undefined at this moment. Presently he is asymptomatic but probably has silent ischemia based on his presentation. The most bothersome feature is he has what would appear to be a low risk factor profile... I spent some time explaining that our challenge would be identifying his risk factors of trying to prevent progression.

(R. 322).

Mr. Dziekan underwent an exercise test on December 23, 2009. There was no evidence of reversible ischemia and ejection fraction was 53%. He achieved 8 METS, which was termed a below average exercise capacity with low fitness capacity, and he developed chest pain at peak exercise. (R. 325-26).

On January 8, 2010, Dr. Peter Kerwin recommended cardiac catheterization of the left side noting coronary artery disease, abnormal Lp(a), hypercholesterolelmia, inferior wall MI, Vitamin D Deficiency, and elevated C-reactive protein. (R. 263). Mr. Dziekan underwent left heart catheterization, left ventriculography, and coronary angiography on January 11, 2010. The procedure

5

revealed that:

> [t]he left main coronary artery is normal. The left anterior descending coronary artery has diagonal braches of 50 to 60% bifurcation stenosis at and involving both the left anterior descending artery and the first diagonal branch. The circumflex coronary artery has a 20 to 30% proximal stenosis. There is a patent stent in the first obtuse marginal branch. The right coronary artery is medium-sized and dominant. There is an area of ulcerated plaque in the proximal vessel with at most 30% to 40% stenosis. There is a patent stent in the mid vessel with a 40% to 50% eccentric stenosis at the distal aspect of this stent.

(R. 269, 444-45).

Mr. Dziekan had another stress test on January 16, 2010, in which he exercised to 11.7 METs before the test was stopped due to his fatigue. It was deemed an abnormal test with below average exercise tolerance and abnormal ECG response. (R. 451).

Mr. Dziekan felt like he was having another heart attack on January 26, 2010, and he went to Good Samaritan Hospital. (R. 292). After consultation with Joseph Hartmann M.D., he was treated with nexium and a thallium stress test was recommended. (R. 293). Imdur – for chest pain or angina – was added to his roster of medications. This included Aspirin, Plavix, Metoprolol, Zocor, Imdur, and Zantac. (R. 294). A thallium scan showed small reversible perfusion defect in the anterior wall, a fixed medium sized posterior inferior perfusion defect, and hypokinesis in the posterior wall. The left ventricle was borderline enlarged and small reversible anterior wall perfusion defect compatible with some reversible ischemia in the anterior wall. (R. 301).

Mr. Dziekan started cardiac/pulmonary rehabilitation on February 10, 2010. (R. 348). It was noted that he had "a 3rd blockage that is decreasing blood flow to the bottom portion of his heart that are medically managing." As a high risk for another MI, he would face bypass surgery if that happened. It was also noted that he and his wife were "very stressed about his diagnosis ... They fear stress, particularly from his job and how this affects his heart and likelihood of another MI."

6

(R. 351).

Mr. Dziekan had a follow-up exam with Dr. Joseph Marek, on April 12, 2010. His main complaint was fatigue. When he went to rehab, he would come home exhausted and had to nap. He was unable to take assignments due to fatigue. (R. 389).

Dr. Philip Branshaw examined Mr Dziekan on April 15, 2010. Mr. Dziekan was struggling with cardiac rehabilitation. He was fatigued and depressed. Dr. Branshaw's diagnosis was cardiovascular disease, hypertension, and hyperlipodemia. Mr. Dziekan's regimen of medications – Simvistatin 10 mg & 20 mg, fish oil, Metoprolol 25 mg, Ecotrin 81 mg, Imdur 30 mg, CoQ10 50 mg, Vitamin D, Plavix 75 mg, Ecotrin 325 mg, and Niaspan 500 mg – was adjusted. He also recommended that Mr. Dziekan exercise moderately 3 times per week. (R. 281-282).

On April 22, 2010, Dr. Bharti Jhaveri reviewed Mr. Dziekan's file for the disability agency. Dr. Jhaveri thought Mr. Dziekan could lift 20 pounds occasionally and 10 pounds frequently. He said that "[i]t is considered that claimant will likely continue to improve with rehab and be able to function within the limits of this assessment within 12 months of onset." (R. 411 ). Another agency physician, Dr. Leif Leaf, suggested a mental status exam on August 19, 2010. (R. 420). Dr. Teny Travis reviewed the file on September 7, 2010, and said there was insufficient evidence to render an opinion on Mr. Dziekan's mental status, and noted that Mr. Dziekan had not shown up for his exam and wanted a decision made on the record. (R. 421, 433).

The ALJ provided Dr. John Cavenagh with the medical file and a form to fill out on October 14, 2010. The doctor was asked to specify what impairment were established by the evidence. He specified none. (R. 440). He said that Mr. Dziekan did not meet listing 4.04 for ischemic heart

7

disease because his stress test was "ok – only minor changes . . . single episode . . . no physical functional impairment 4 mos after MI." (R. 441). When asked whether Mr. Dziekan had "*any* functional limitations or restrictions," he said that he had "[n]o symptoms. No physical limitations documented. Cardiac rehab was successfully terminated 3-22-10, following his MI Nov. 9 and stent placement 1-11-10." (R. 441).

On April 11, 2011, Dr. Pauline Harding, opined that Mr. Dziekan was disabled since November 2009 due to marked coronary artery disease with extensive cardiac muscle damage and adrenal insufficiency. She noted his lipoprotein (a) level was 267 and that, genetically that put him at high risk of myocardial infarction. The stress test of December 2009 showed a severe decrease in the blood flow in a large area of the inferoseptal and inferilateral wall with inferior akinesis (R. 226). On March 29, 2012, Dr. Harding stated that Mr. Dziekan was "completely disabled due to coronary artery disease and adrenal insufficiency." (R. 472).

## C.
### The Plaintiff's Statement

Mr. Dziekan stated that he would generally wake up, eat breakfast, and take his medications. They caused drowsiness, so he would sometimes nap thereafter. He would use his computer, eat lunch, and go to cardio rehab. Rehab was an hour of exercise, and he would come home from that exhausted. Mr. Dziekan would then sleep for an hour, go back on the computer or watch TV, and then eat dinner. After dinner, he would go to bed. Sometimes he'd accompany his wife to the store, empty the dishwasher, or pay bills on the internet. (R. 125).

Mr. Dziekan explained that, due to his condition, he could no longer walk in cold weather, deal with stress, or do any photography work, including weddings. (R. 126). He had become forgetful. (R. 127). He did not do yard work, but did some minor repairs around the house. (R.

8

127-28). He had become isolated from friends. (R. 130). He had a hard time concentrating and would doze off while reading. (R. 130). He did not handle stress well. (R. 131).

## D.
## The ALJ's Decision

Judge Templan began by providing a version of the Dziekans' administrative difficulties that had a somewhat demeaning tone. He said that he "was advised that the claimant's wife had expressed a desire to have a decision made without a hearing." (R. 17). He neglected the fact that the Dziekans had also expressed a desire to be present so that they could explain Mr. Dziekan's condition to the ALJ. The ALJ went on to state that the Dziekans felt a hearing was a "needless formality" that would only dely a "justified award of benefits." (R. 17-18). He also made a point of noting that Mrs. Dziekan had written that her husband had paid into the system – he did, for over three decades – and needed his benefits. (R. 19). The ALJ also inaccurately and inexplicably stated – twice – that Mr. Dziekan had been uncooperative with the disability agency, failing to attend his consultative examination. (R. 21, 24). Inexplicably ignored was the fact that the agency had informed Mr. Dziekan that the exam had been cancelled.

When the ALJ finally finished this seeming disparagement of Mr. Dziekan and got down to the task at hand, he concluded that Mr. Dziekan had "at least one, medically determinable, 'severe' impairment . . . ." (R. 20). He relied on the reports from the two reviewing agency physicians and Dr. Cavenagh, to whom he had sent Mr. Dziekan's file. He specifically noted that Dr. Cavenagh found Mr. Dziekan had completed cardiac rehab and had no symptoms or functional limitations. (R. 21). The ALJ then determined that Mr. Dziekan did not have an impairment that met or equaled a listed impairment. He relied on the December 2009 stress test to find that Mr. Dziekan did not meet Listing 4.04 because he was able to exercise to 8 METs. (R. 22). Mr Dziekan did not meet

9

Listing 4.04C because the evidence did not have "very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living." (R. 23). This was based on Mrs. Dziekan's report that Mr. Dziekan could perform his own personal care, help with light housework and repairs, drive a car, work out at cardiac rehab, and go for walks without an ambulatory aid. (R. 23). As we shall see, this startling and tendentious conclusion is simply not borne out by the record.

The ALJ then summarized the medical evidence. He relied on the opinion of Dr. Jhaveri – a state agency reviewing physician – to conclude that Mr. Dziekan could perform a full range of light work. (R. 25). Although Mr. Dziekan's past work as a photojournalist with the Tribune far exceeded this level, the ALJ relied on a questionnaire he had provided to the VE to find that Mr. Dziekan could do this type of work as it was generally performed in the national economy. (R. 25). Accordingly, the ALJ concluded that Mr. Dziekan was not disabled under the Act. (R. 25-26).

## IV.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010)(*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to

whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It has also called it a lax standard. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008).

**B.**
**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005).

An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352; *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

There are several problems with the ALJ's decision, and they are interwoven with the procedural history and problems with this case – all of which led to Mr. Dziekan not appearing at his hearing, to being unrepresented by counsel, and to being denied benefits at the administrative level and, to a degree, by the ALJ. The tone of the ALJ's comments seemed to ascribe to Mr. Dziekan an unwillingness to cooperate with the application process and to attribute to him a sense of entitlement. The ALJ's comments simply refused to acknowledge Mr. Dziekan had every right to be distressed about the bureaucratic bungling to which he had been subjected, that he had, in fact,

fallen into dire straights, and that, in fact, he had been seriously misled by the Social Security Administration into fatal missteps.

## 1.
## The Waiver Of Appearance Before The ALJ

A claimant can waive his right to appear before an ALJ, if he does so voluntarily and intelligently. An ALJ's determination that there has been a valid waiver is a finding of fact that must stand if it is supported by substantial evidence. *Smith v. Chater*, 1995 WL 695955, 2 (7th Cir. 1995). As with any other finding that must be supported by substantial evidence, an ALJ cannot reach a conclusion by ignoring pertinent evidence. That's what the ALJ did here. He ignored the Dziekans' requests to appear before an ALJ to explain Mr. Dziekan's condition and the circumstances that led to the decision to file the waiver form. They were led to believe that was the only way they could request an expedited decision, which they were desperate for given their financial situation.

They were also misled about what would happen thereafter. (It must not be forgotten that Mrs. Dziekan's version of the information the Dziekans were given at the ALJ's offices that convinced them to employ the waiver form stands uncontradicted). The ALJ's assistant implied that, if their claim were denied, the Appeals Council would grant them a hearing. Actually, the odds were between 3-1 and 4-1 against that. Consequently, the ALJ's waiver determination cannot be upheld, and this matter must be remanded for a hearing that allows the Dziekans to appear before an ALJ.

## 2.
## The Waiver of Representation

A claimant has a statutory right to be represented by counsel, *see* 42 U.S.C. § 406, but, as with an appearance before an ALJ, he right may waive that right if he does so validly. To obtain a

valid waiver, an ALJ must explain to the claimant "(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingent arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees." *Million v. Astrue*, 260 Fed.Appx. 918, 920-21(7th Cir. 2008); *Skinner v, Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Here, of course, the ALJ never had the opportunity to explain anything to Mr. Dziekan, so the Commissioner must rely on the series of notices the Social Security Administration sent to the Dziekans to show that Mr. Dziekan validly waived his right to representation. The sticking point with those notices – and there were a few of them – is the 25% cap on legal fees.

On April 26, 2010, following the initial denial of his claim, Mr Dziekan received notice of his right to representation. In pertinent part, it read:

> There are groups that can help you find a lawyer or give you free legal services if you qualify. There are also lawyers who do not charge unless you win your appeal.. . . If you hire someone, we must approve the fee before he or she can collect it. And if you hire a lawyer we will withhold up to 25 percent of any past due Social Security benefits to pay toward the fee.

(R. 36). There was no mention that any fee would be *capped* at 25% of past due benefits. There was nothing to suggest that, while the Social Security administration would withhold 25% or past due benefits, that was "to pay *toward* the fee," not the total fee. The letter indicates that Mr. Dziekan's lawyer could charge whatever he or she liked. The Administration could approve a 50% for all Mr. Dziekan knew. And why not? This was the agency that cancelled his consultative exam, and then denied his claim because he didn't go to the exam. Mr. Dziekan received the same information on August 5, 2010, and September 7, 2010. (R. 41-42, 45-46). Again, there was nothing that indicated that he would never have to pay any more than 25% of past due benefits.

14

The next notice Mr. Dziekan received was a 2-page letter, dated September 24, 2010, acknowledging his request for a hearing and, along the way, stating that "[y]our representative may not charge or receive any fee unless we approve it." (R. 52-53). Nowhere in the letter did the phrase "25 percent" even appear. Mr. Dziekan had now read through four consecutive notices from the Administration that detailed his right to representation without any mention that he would pay no more than 25 percent of his past due benefits for legal services.

Attached to this fourth letter were 2 more, double-columned pages detailing Mr. Dziekan's "Right to Representation." (R. 54-57). Within that document were several references to fees. One said a representative could not charge or collect a fee without written approval from the Social Security Administration. (R. 54). There was no mention of any 25 percent limitation. Another said that the representative had to file a fee agreement and could not charge more than the fee the Social Security Administration approved. (R. 55). It did not suggest that the Administration would not approve any fee over 25 percent of past due benefits. Another said that the Social Security Administration would "*[u]sually* . . . approve the [fee] agreement . . . as long as . . . the fee you agreed on is no more than 25 percent of past due benefits or $6,000, whichever is less." (R. 54-55)(emphasis supplied). And so, it took four notices, and about 10 pages, until the Social Security Administration got around to telling Mr. Dziekan about a ceiling on fees. But the "usually" qualifier could be interpreted to mean that this was not always the case. And that was just for administrative work. The "Right to Representation" document also indicated that, if Mr. Dziekan appealed his claim to federal court, "[t]he fee *usually* will not exceed 25 percent of past due benefits." (R. 55)(emphasis supplied). The "usually" again wipes out any qualifier.

The sum total of these four notices do not amount to an explanation "to the claimant that

15

...the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees." *Skinner,* 478 F.3d at 841. Quite the contrary. They leave open the possibility, in varying degrees, that the fee could be anything. It's curious, indeed, that the vehicle the Administration employs to explain to *unrepresented* claimants their right to representation and the cap on its cost is so obtuse. The combined effect of the four notices is confusing at best and misleading at worst. It is as though a crafty attorney has written it in an attempt to be non-committal.

If the ALJ fails to obtain a valid waiver of counsel, his duty to develop the record is heightened, and he must "'scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'" *Id.* at 841-42. And the burden is then on the Commissioner to show that the ALJ adequately developed the record. There is no presumption that the claimant has presented his or her best case before the ALJ. *Id.* at 842.

It's fairly clear here that the ALJ did not scrupulously and conscientiously probe into all the facts. As already discussed, his decision was couched in some unfavorable terms that were the product of him ignoring certain points in the record. For example, the ALJ twice pointed out in his decision that Mr. Dziekan had been uncooperative during the application process and had failed to attend a consultative exam. Of course, he failed to attend because he was informed it was cancelled, a point Judge Templin inexplicably ignored. It is mystifying how Mr. Dziekan is to be faulted for an omission for which he was not responsible.

The ALJ then stated that Mr. Dziekan "perceived that any emotional dysfunction was secondary to his cardiac condition, and not due to any mental disorder" and cited to Exhibit 17F. That exhibit is nothing more than the text of the listing for cardiovascular impairments, and it is anyone's guess how this gave the ALJ insight into Mr. Dziekan's perception.

16

The Commissioner puts a great deal of stock in the fact that on October 13, 2010, Mr. Dziekan was provided with a CD from the Office of Disability and Adjudication Review that supposedly contained all the evidence in his file to date and explained that he had the responsibility to provide any additional evidence he wanted in the record. The problem with that CD is that it did not contain a linchpin of the ALJ's decision, namely the opinion of the medical expert, Dr. Cavenagh.[1] It is troubling that the opinion in this case is dated October 14th – the day after the ALJ's offices sent Mr. Dziekan the (incomplete) CD and informed him his "file was now ready for review." R. 182). It clearly was not, and Mr. Dziekan could not have anticipated the use that would be made of evidence not provided to him.

If ever a claimant could have used an attorney from the outset of the administrative process, it was Mr. Dziekan: an examination the agency cancelled was used against him; he and his wife were misled into filing a waiver of appearance; and he was sandbagged by not having been provided with a CD that contained all the evidence that would be used against him. The administrative process is supposed to be non-adversarial. *Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010). This one fell short of that goal. And, unfortunately, it cannot be said that the ALJ fulfilled his heightened duty to fully and fairly develop the record in this case or to scrupulously probe into all the facts.

**3.**

This case must be remanded for a full and fair hearing on Mr. Dziekan's claim, but it is worth making a couple of other points about the ALJ's decision. First, Dr. Cavenagh's opinion was

---

[1] The Commissioner falsely submits that the ALJ rejected the opinion of Dr. Cavenagh, even though he did not actually say as much in his decision. Quite the contrary. The ALJ specifically relied on Dr. Cavenagh's opinion in his discussion of whether Mr. Dziekan's condition met a listed impairment. (R. 22 (" . . . the medical expert opined that, four months past onset, the asymptomatic claimant did not have the documented functional limitations required by the Listing of Impairments.").

17

startling – not only because it appeared in the file after the file was supposedly complete and sent to Mr. Dziekan, but because of what it contained. The doctor said Mr. Dziekan was completely recovered, finished with cardiac rehabilitation, and was symptom-free. Actually, he was not through with cardiac rehab and, in fact, he was struggling with it. (R. 281-82, 389). It exhausted him and, afterward, he had to sleep. So the three main points of Dr Cavenagh's opinion are contradicted by the very record he supposedly reviewed.

Also, the ALJ found that Mr. Dziekan did not meet Listing 4.04C because he did not have any serious limitations in his ability to initiate, sustain, or complete activities of daily living. In so doing, he took snippets from the statement the Dziekans filed. While the ALJ recounted the minimal activities Mr. Dziekan engaged in, he did not mention the uncontradicted effect they had on him. After activity, he suffered extreme fatigue and had to nap. He was forgetful and needed reminders to eat, take his medication, and go to doctor's appointments. He had troubling completing tasks. He could not go out alone in cold weather because it exacerbated his condition. He didn't socialize, and spent his waking hours watching TV or looking at photos. (R. 121-34, 201-10). When an ALJ considers a claimant's daily activities, he must do so with care. He must not give undue weight to those activities, *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008), and he cannot simply ignore the significant restrictions that accompany them. *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Punzio v. Astrue,* 630 F.3d 704, 712 (7th Cir. 2011).

Staying with the ALJ's listing analysis, the Commissioner argues that, even if the ALJ erred, Listing 4.00C applies only to individuals who cannot take a stress test. But the ALJ did not mention that, and his decision was not based on it. This is yet another example of the Commissioner

violating the *Chenery* doctrine by supplying the reasoning for the ALJ. *See Roddy*, 705 F.3d at 637; *Hughes v. Astrue*, 705 F.3d 276, 279 (7th Cir. 2013); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). The Seventh Circuit has stated that this tactic is "sanctionabl[e]." *Hughes*, 705 F.3d at 279.

## CONCLUSION

There is a large segment of the population that has worked their entire adult lives – Mr. Dziekan has worked since he was 16 – and are unfamiliar with government entitlement programs. They are not as conversant as, say, a Supplemental Security Income applicant might be in the language government bureaucracies employ in their "informative" notices. The fact that they have "paid into the system" for decades (as the ALJ derisively quoted the plaintiff ( R.19)) and feel they are as deserving of the same fair treatment as anyone else has nothing to do with entitlement to Social Security benefits and ought not be held against them. Given all that occurred in this case, a remand is required. And given the record in this case, it is strongly recommended that on remand, a different ALJ be assigned to this case. *See Terry v. Astrue*, 580 F.3d 471,478 (7th Cir. 2009); *Golembiewski v. Barnhart,* 322 F.3d 912, 918 (7th Cir. 2003); *Sarchet v. Chater,* 78 F.3d 305, 309 (7th Cir.1996). A reassignment will assure that justice will, as it must, "'satisfy the appearance of justice.'" *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* 508 U.S. 602 (1993). "'[T]his stringent rule may sometimes bar trial [even] by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.'" *Id*. at 618 (bracket in original). *Accord, Siefert v. Alexander,* 608 F.3d 974, 985 (7th Cir. 2010).

The plaintiff's motion for summary judgment or remand [# 14] is GRANTED, and the defendant's motion for summary judgment [#19] is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 7/30/13